1

**CANDIS MITCHELL**
California State Bar No. 242797
**FEDERAL DEFENDERS OF SAN DIEGO, INC**.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Fax: (619) 687-2666
Candis_Mitchell@fd.org

2

3

4

5

Attorneys for Mr. Mario Raymond Fernandez

6

7

8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

**(HONORABLE THOMAS J. WHELAN)**

11

| UNITED STATES OF AMERICA, | ) | Case No. 07cr3405-W |
|---|---|---|
| Plaintiff, | ) | |
| | ) | STATEMENT OF FACTS AND |
| v. | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF |
| **MARIO RAYMOND FERNANDEZ**, | ) | DEFENDANT'S MOTIONS |
| Defendant. | ) | |

12

13

14

15

16

17

**I.**

18

**STATEMENT OF FACTS**[1]

19

**A.    The Stop and Arrest of Mr. Fernandez**

20

On December 9, 2007, Customs and Border Patrol Agents were performing surveillance in

21

Calexico, California, in a neighborhood directly north of the International Border Fence. In this

22

developed neighborhood, Agents Sedano and Carter took positions that would allow them

23

surveillance of the border fence and surrounding area. After nightfall, both officers observed Mr.

24

Fernandez and Mr. Flores-Blanco walking about in the neighborhood.

25

At approximately 8:00 p.m., the officers said they observed Mr. Fernandez and Mr. Flores-

26

_____

27

    [1] Unless otherwise stated, the "facts" referenced in these papers come from government-produced discovery that the defense continues to investigate. Mr. Fernandez does not admit the accuracy of this information and reserves the right to challenge it at any time.

28

1    Blanco converse for a short period of time on the street and then walk to the backyard of Mr. Flores-

2    Blanco's residence at 806 West Second Street, Calexico, California.  The agents contend that during

3    the course of their surveillance, they observed Mr. Fernandez walk around the area of Mr. Flores-

4    Blanco's home and make numerous phone calls.

5         According to the agents, at approximately 12:40 a.m. Mr. Fernandez and Mr. Flores-Blanco

6    exited the backyard of Mr. Flores-Blanco.  They separated and Mr. Fernandez walked south along

7    Encinas Avenue while Mr. Flores-Blanco walked to a nearby set of apartments referred to as the

8    "White Apartments."

9         While they were observing the actions of Mr. Fernandez and Mr. Flores-Blanco, the agents

10   became aware of a suspected alien smuggler and undocumented individual on the other side of the

11   international fence.  According to the agents, it appeared that the smuggler was in communication

12   with someone on a cell phone.  They contend that they heard Mr. Fernandez say, "we're ready, now,

13   now," while he was waving.  The agents also report that Mr. Flores-Blanco was by the side of the

14   "White Apartments"at the same time Mr. Fernandez was waiving..

15        At approximately 12:45 a.m. a Remote Video Surveillance System operator notified Agents

16   Serano and Carter that an individual was climbing the International Border Fence near the "White

17   Apartments."  The agents responded to the area, after seeing someone run from the fence to the side

18   of the apartments.  Upon questioning the material witness, Mr. Portillo-Mendoza, he revealed that

19   a friend of his made all of his arrangements to bring him into the United States    Further, Mr.

20   Portillo-Mendoza stated that he climbed the fence upon instruction of the individual on the Mexican

21   side of the fence who instructed him to run to the individual who was waiving at him, but once he

22   reached the "White Apartments" that individual was no longer there.  Mr. Portillo-Mendoza could

23   not identify either Mr. Fernandez or Mr. Flores-Blanco when shown a photo-lineup post arrest.

24   **B.**    **Interrogation**

25        At the border patrol station, Mr. Fernandez was read his Miranda rights and questioned

26   regarding the incident.  Mr. Fernandez made statements regarding his involvement in the offense.

27   He indicated that he had gone a friend's house to visit with his brother, who he had hoped was there.

28   After not being able locate his brother at either location that he looked for him at, Mr. Fernandez

1  walked past Mr. Flores-Blano's home and exchanged pleasantries before continuing on to another

2  friend's house. Mr. Fernandez ardently denied being involved in smuggling any individuals and had

3  no cell phone on his person at the time of his arrest.

4  **C.    Grand Jury and Indictment**

5        On December 19, 2007, Mr. Fernandez was indicted for encourageing and inducing an alien

6  to enter and reside in the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(II).  The

7  indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

8  instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.

9  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is

10  attached hereto as Exhibit A.  Judge Burns' instructions deviate from the instructions at issue in the

11  major Ninth Circuit cases challenging a form grand jury instruction previously given in this district

12  in several ways.[2]

13        After repeatedly emphasizing to the grand jurors that probable cause determination was their

14  sole responsibility, see Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were

15  forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or

16  not there should be a federal law or should not be a federal law designating certain activity [as]

17  criminal is not up to you."  See id. at 8.  The instructions go beyond that, however, and tell the grand

18  jurors that, should "you disagree with that judgment made by Congress, then your option is not to

19  say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or

20  'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus,

21  the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree

22  with a proposed prosecution.

23

24

25      [2]    See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States

26  v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United

27  States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

28      [3]  See also id. at 20 ("You're all about probable cause.").

1    Immediately before limiting the grand jurors' powers in the way just described, Judge Burns

2    referred to an instance in the grand juror selection process in which he excused three potential jurors.

3    See id. at 8.

4        I've gone over this with a couple of people.  You understood from the questions and
      answers that a couple of people were

5

6        excused, I think three in this case, because they could not adhere to the principle that
      I'm about to tell you.

7    Id.  That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their

8    disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors

9    on his view of their discretion; he enforced that view on pain of being excused from service as a

10   grand juror.

11       In addition to his instructions on the authority to choose not to indict, Judge Burns also

12   assured the grand jurors that prosecutors would present to them evidence that tended to undercut

13   probable cause.  See id. at 20.[4]

14       Now, again, this emphasizes the difference between the function of the grand jury
      and the trial jury.  You're all about probable cause.  If you think that there's evidence

15   out there that might cause you to say "well, I don't think probable cause exists," then
      it's incumbent upon you to hear that evidence as well.  As I told you, in most

16   instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against
      what they may be asking you to do if they're aware of that evidence.*

17

18   Id. (emphasis added).[5]  The district court later returned to the notion of the prosecutors and their

19   duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in

20   from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

21   presented to you."  See id. at 27.

22       These motions follow.

23   / / /

24

_____

25      [4]   These instructions were provided in the midst of several comments that praised the

26   United States attorney's office and prosecutors in general.

27      [5]   The "in most instances" language suggests that there may be some limit on this principle.

28   Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the
     instant footnote.

## II.

## MOTION TO JOIN WITH CO-DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Mr. Fernandez, hereby joins with defendant Mr. Flores-Blanco's Notice of Motion and Motion to Suppress Evidence, and Memorandum of Points and Authorities in Support of Defendant's Motions (Document 15, filed January 8, 2008).

## III.

## MOTION TO SUPPRESS STATEMENTS

Mr. Fernandez moves to suppress any statements made at the time of his arrest on the grounds that *his Miranda* waiver was not knowing, intelligent, and voluntary. Moreover, Mr. Fernandez moves to suppress any other statements made on the grounds that those statements were not made voluntarily.

### A.    The Government Must Demonstrate Compliance with *Miranda*.

In order for any statements made by Mr. Fernandez to be admissible against him, the government must demonstrate that they were obtained in compliance with Miranda v. Arizona, 384 U.S. 436 (1966). Specifically, the government must establish that Mr. Fernandez waived his rights and that any waiver of his Miranda rights was voluntary, knowing, and intelligent. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973). When an interrogation continues without the presence of an attorney, and a statement results, the government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his privilege against self-incrimination. Miranda, 384 U.S. at 475. The court must indulge every reasonable presumption against waiver of fundamental constitutional rights, so the burden on the government is great. United States v. Heldt, 745 F. 2d 1275, 1277 (9th Cir. 1984).

In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality of the circumstances surrounding the case. Edwards v. Arizona, 451 U.S. 477 (1981); United States v. Garibay, 143 F.3d 534 (9th Cir. 1998). The Ninth Circuit has held that determination of the validity of a Miranda waiver requires a two prong analysis: the waiver must be both (1) voluntary and (2) knowing and intelligent. Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990). The second prong requires an inquiry into whether "the waiver [was] made with a full awareness both

1  of the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u>

2  at 820-821 (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987)).  Not only must the waiver be

3  uncoerced, then, it must also involve a "requisite level of comprehension" before a court may

4  conclude that <u>Miranda</u> rights have been legitimately waived.  <u>Id</u>. (quoting <u>Colorado v. Spring,</u> 479

5  U.S. at 573).    Unless and until <u>Miranda</u> warnings and a knowing and intelligent waiver are

6  demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

7  against the defendant.  <u>Miranda</u>, 384 U.S. at 479.  The government in this case must prove that Mr.

8  Fernandez  waived his rights intelligently and voluntarily.  Mr. Fernandez disputes any allegation

9  that his waiver was knowing, intelligent, and voluntarily.

10  **B.    Mr. Fernandez's Statements Must Be Voluntary.**

11      Even if this Court determines that Mr. Fernandez validly waived his <u>Miranda</u> rights, it must

12  still make a determination that any statements are voluntary.  Under 18 U.S.C. § 3501(a), this Court

13  is required to determine, whether any statements made by Mr. Fernandez are voluntary.  In addition,

14  section 3501(b) requires this Court to consider various enumerated factors, including whether Mr.

15  Fernandez understood the nature of the charges against his and whether he understood his rights.

16  Without such evidence, this Court cannot adequately consider these statutorily mandated factors.

17      Moreover, section 3501(a) requires this Court to make a factual determination.  Where a

18  factual determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings.  *See*

19  <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings

20  are often as important as the trial itself,'" <u>id</u>. at 610 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46

21  (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation

22  of purported evidence in a prosecutor's responsive pleading.  Therefore, prior to admitting any

23  alleged statements from Mr. Fernandez, a hearing must be held to determine whether the statements

24  were voluntary.

25  */ / /*

26  */ / /*

27  */ / /*

28  */ / /*

1

**IV.**

2

3

4

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING Mr. FERNANDEZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

5

**A.    Introduction.**

6

The indictment in the instant case was returned by the January 2007 grand jury.  See CR at

7

9.[6]  That grand jury was instructed by this Court on January 11, 2007.  See Reporter's Partial

8

Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit

9

A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in

10

the major Ninth Circuit cases challenging a form grand jury instruction previously given in this

11

district in several ways.[7]  These instructions compounded this Court's erroneous instructions and

12

comments to prospective grand jurors during voir dire of the grand jury panel, which immediately

13

preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11,

14

2007, a copy of which is attached hereto as Exhibit B.[8]

15

16

17

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

18

After repeatedly emphasizing to the grand jurors that probable cause determination was their

19

sole responsibility, see Ex. A at 3, 3-4, 5,[9] this Court instructed the grand jurors that they were

20

21

[6] "CR" refers to the Clerk's Record in Case Number 07cr3405-W.

22

23

24

[7] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

25

26

27

[8] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr. Fernandez requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

28

[9] See also id. at 20 ("You're all about probable cause.").

forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, this Court referred to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was this Court's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between this Court and various prospective grand jurors, reveals how this Court's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, this Court makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

07cr3405-W

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Fernandez will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that it would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id. Such a case "should go forward." See id. Given that blanket

07cr3405-W

proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."

> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

07cr3405-W

That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does. *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
REA: It would depend on the case.
The Court: Is there a chance that you would do that?
REA: Yes.
The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[10] See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

---

[10] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence. See Ex. A at 6. This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances." See id. This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

07cr3405-W

### 2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.[11]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

---

[11] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

07cr3405-W

1    The antecedent to this instruction is also found in the voir dire.  After advising the grand

2    jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14,

3    Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.

4    If there's something adverse or that cuts against the charge, you'll be informed of that.  They have

5    a duty to do that."  See id.  Thus, Judge Burns unequivocally advised the grand jurors that the

6    government would present any evidence that was "adverse" or "that cuts against the charge."  See

7    id.

8    **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the
         Powers of the Grand Jury, Which Judge Burns Far Exceeded in His
9         Instructions as a Whole During Impanelment.**

10    The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions

11    given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.

12    While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of

13    adopting a highly formalistic approach[12] to the problems posed by the instructions, endorsed many

14    of the substantive arguments raised by the defendants in those cases.  The district court's instructions

15    cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.  Taken

16    together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those

17    at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand

18    jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-

19    prosecutorial discretion.  That is not the institution the Framers envisioned.  See United States v.

20    Williams, 504 U.S. 36, 49 (1992).

21    For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-

22    Vargas II majority acknowledges that the two institutions perform similar functions: "'the public

23    prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs

24    much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v.

---

26    [12]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
27    majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
      imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
28    constitutional independence.").

1  Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900

2  (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this

3  regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at

4  1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any

5  indictment or presentment returned by a grand jury, id., but also that "the grand jury has no

6  obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id.  See

7  Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal

8  Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably

9  . . . the most important attribute of grand jury review from the perspective of those who insisted that

10  a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

11  Procedure § 15.2(g) (2d ed. 1999)).

12  　　　Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes

13  set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

14  　　　The grand jury thus determines not only whether probable cause exists, but also
　　　whether to "charge a greater offense or a lesser offense; numerous counts or a single

15  　　　count; and perhaps most significant of all, a capital offense or a non-capital offense --
　　　all on the basis of the same facts.  And, significantly, the grand jury may refuse to

16  　　　return an indictment even "'where a conviction can be obtained.'"

17  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's

18  description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that

19  the grand jury "controls not only the initial decision to indict, but also significant questions such as

20  how many counts to charge and whether to charge a greater or lesser offense, including the important

21  decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge

22  Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the

23  majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor

24  has established probable cause that this individual has committed a crime."  See id. at 1214

25  (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting);

26  United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

27  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth

28  Circuit.  But not in Judge Burns's instructions.

1  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion
2         Established in Both *Vasquez* and *Navarro-Vargas II*.**

3        The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the

4  grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its

5  previous decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand

6  jurors indict upon every finding of probable cause because the term "should" may mean "what is

7  probable or expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should"

8  makes no sense in context, as Judge Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at

9  1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be

10  understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe

11  the grand jury's constitutional independence.").  See also id. ("The 'word' should is used to express

12  a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579 (1999)

13  (brackets in original)).

14        The debate about what the word "should" means is irrelevant here; the instructions here make

15  no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply

16  may not choose not to indict in the event of what appears to them to be an unfair application of the

17  law: should "you disagree with that judgment made by Congress, then your option is not to say 'well,

18  I'm going to vote against indicting even though I think that the evidence is sufficient'...."  See Ex.

19  A at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because they

20  disagree with a proposed prosecution. No grand juror would read this language as instructing, or

21  even allowing, him or her to assess "the need to indict."  Vasquez, 474 U.S. at 264.

22        While Judge Burns used the word "should" instead of "shall" during voir dire with respect

23  to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is

24  clear that Judge Burns could only mean "should" in the obligatory sense.  For example, when

25  addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there

26  is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate

27  and not indict."  See id. at 8.  At least in context, it would strain credulity to suggest that Judge Burns

28

15                                07cr3405-W

was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205.  Clearly Judge Burns was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[13]  Jurors are not presumed to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th

---

[13] This argument does not turn on Mr. Fernandez's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed

2    the correct one") (citation, internal quotations and brackets omitted).

3            Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it

4    explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

5            **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted

6    voir dire and excused a potential juror (CSW):

7            The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't
             want you to say, "Well, yeah, there's probable cause.  But I still don't like what the
8            government is doing.  I disagree with these laws, so I'm not going to vote for it to go
             forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you
9            can tell me that.
             Prospective Juror: Well, I think I may fall in that category.
10           The Court: In the latter category?
             Prospective Juror: Yes.
11           The Court: Where it would be difficult for you to support a charge even if you
             thought the evidence warranted it?
12           Prospective Juror: Yes.
             The Court: I'm going to excuse you then.
13
14   See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a

15   prospective juror.  Even if the prospective juror did not like what the government was doing in a

16   particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote

17   that might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction

18   for the possibility of independent judgment was dismissal, a result that provided full deterrence of

19   that juror's discretion and secondary deterrence as to the exercise of discretion by any other

20   prospective grand juror.

21           **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear

22   that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no

23   other prerogative.

24   Court  . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

25           You'd have a similar *obligation* as a grand juror even though you might have to grit
             your teeth on some cases.  Philosophically, if you were a member of Congress, you'd
26           vote against, for example, criminalizing marijuana.  I don't know if that's it, but
             you'd vote against criminalizing some drugs.

27           That's not what your *prerogative* is here.  Your prerogative instead is act like a judge
             and to say, "All right.  This is what I've got to deal with objectively.  Does it seem
28           to me that a crime was committed?  Yes.  Does it seem to me that this person's

involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused. Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

**(3)**   As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here." See id. at 61.

**(4)**   And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

07cr3405-W

1    Moreover, Judge Burns advised the grand jurors that the were forbidden from considering

2    the penalties to which indicted persons may be subject.

3        Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the
    case is about because there is a disparity between state and federal law.

4        The Court:  In what regard?
    Prospective Juror: Specifically, medical marijuana.

5        The Court:  Well, those things -- the consequences of your determination shouldn't
    concern you in the sense that penalties or punishment, things like that -- *we tell trial*

6        *jurors, of course, that they cannot consider the punishment or the consequence that*
    *Congress has set for these things. We'd ask you to also abide by that.*  We want you

7        to make a business-like decision of whether there was a probable cause. ...

8    See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable

9    cause" would obviously leave no role for the consideration of penalty information.

10    The Ninth Circuit previously rejected a claim based upon the proscription against

11    consideration of penalty information based upon the same unlikely reading of the word "should"

12    employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).

13    Cortez-Rivera is inapposite for two reasons.  First, Judge Burns did not use the term "should" in the

14    passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning

15    in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.

16    The instructions again violate Vasquez, which plainly authorized consideration of penalty

17    information.  See 474 U.S. at 263.

18    Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time

19    and time again that they had a duty, an obligation, and a singular prerogative to indict each and every

20    case where there was probable cause.  These instructions go far beyond the holding of Navarro-

21    Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it

22    defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could

23    possibly believe what the Supreme Court held in Vasquez:

24        The grand jury does not determine only that probable cause exists to believe that a
    defendant committed a crime, or that it does not.  In the hands of the grand jury lies

25        the power to charge a greater offense or a lesser offense; numerous counts or a single
    count; and perhaps most significant of all, a capital offense or a non-capital offense –

26        all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict
    in every case where a conviction can be obtained."

27

28

1    474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

2    J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls

3    not only the initial decision to indict, but also significant decisions such as how many counts to

4    charge and whether to charge a greater or lesser offense, including the important decision whether

5    to charge a capital crime.").   Nor would the January 2007 grand jury ever believe that it was

6    empowered to assess the "the need to indict." See id. at 264.  Judge Burns's grand jury is not

7    Vasquez's grand jury.  The instructions therefore represent structural constitutional error "that

8    interferes with the grand jury's independence and the integrity of the grand jury proceeding." See

9    United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be

10   dismissed. Id.

11          The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

12   instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

13   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

14   decisions."   408 F.3d at 1200.   As a result, the majority discounts the effect that a judge's

15   instructions may have on a grand jury because "it is the *structure* of the grand jury process and its

16   *function* that make it independent."  Id. at 1202 (emphases in the original).

17          Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that

18   the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

19   unreviewability of many of its decisions -- sufficiently protects that power."  See id. at 1214

20   (Hawkins, J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that

21   it lacks power to do anything beyond making a probable cause determination ... unconstitutionally

22   undermines the very structural protections that the majority believes save[] the instruction."  Id.

23   After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'"

24   Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that "invariable assumption" were

25   to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez.  Indeed,

26   "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions

27   because nothing will happen if they disobey them."  Id.

28

1    In setting forth Judge Hawkins' views, Mr. Fernandez understands that Judge Burns may not

2    adopt them solely because the reasoning that supports them is so much more persuasive than the

3    majority's sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already

4    untenable reasoning.

5    Here, again, the question is not an obscure interpretation of the word "should", especially in

6    light of the instructions and commentary by Judge Burns during voir dire discussed above -

7    unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the

8    defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition

9    of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions.  Navarro-Vargas II is

10   distinguishable on that basis, but not only that.

11   Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly

12   states they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth

13   Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

14   principle...."  See Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its

15   deliberations cannot embolden grand jurors who are no longer there, likely because they expressed

16   their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at

17   1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to

18   protect the accused from the other branches of government by acting as the 'conscience of the

19   community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The

20   federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

21   jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

22   fashioned his own rules and enforced them.

23   **D.    The Instructions Conflict with Williams' Holding That There Is No Duty to
       Present Exculpatory Evidence to the Grand Jury.**

24

25   In Williams, the defendant, although conceding that it was not required by the Fifth

26   Amendment, argued that the federal courts should exercise their supervisory power to order

27   prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

28   required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a

21                                                      07cr3405-W

1    general matter at least, no such 'supervisory' judicial authority exists." See id. at 47. Indeed,

2    although the supervisory power may provide the authority "to dismiss an indictment because of

3    misconduct before the grand jury, at least where that misconduct amounts to a violation of one of

4    those 'few, clear rules which were carefully drafted and approved by Judge Burns and by Congress

5    to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve

6    as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id. at 47

7    (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own

8    initiative, rules of grand jury procedure." Id. at 50. As a consequence, Williams rejected the

9    defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.

10   See id. at 51-55.

11        Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors

12   would present to them evidence that tended to undercut probable cause. See Ex. A at 20.

13        Now, again, this emphasizes the difference between the function of the grand jury
     and the trial jury. You're all about probable cause. If you think that there's evidence
14       out there that might cause you say "well, I don't think probable cause exists," then
         it's incumbent upon you to hear that evidence as well. As I told you, in most
15       instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against
         what they may be asking you to do if they're aware of that evidence.*
16

17   Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and

18   their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear

19   in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

20   presented to you." See id. at 27. The Ninth Circuit has already concluded it is likely this final

21   comment is "unnecessary." See Navarro-Vargas, 408 F.3d at 1207.

22        This particular instruction has a devastating effect on the grand jury's protective powers,

23   particularly if it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow

24   concluded was not conveyed by the previous instruction: "You're all about probable cause." See Ex.

25   A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause

26   determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had

27   already told the grand jurors that they likely would be excused if they rejected this limitation). The

28   instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable

cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can  presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.

(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)    Because no such evidence was presented to me, I may conclude that there is none. Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.

## <u>CONCLUSION</u>

For the reasons stated, Mr. Fernandez requests that this Court grant his motions.

Respectfully submitted,

<u>*s/ Candis Mitchell*</u>
**CANDIS MITCHELL**
Dated: March 3, 2008
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Fernandez
Candis_Mitchell@fd.org

07cr3405-W